IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

TERRI HUGHEY o/b/o
M.E. (minor child)                                         PLAINTIFF

V.                            NO. 10-5194

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration         DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Terri Hughey, brings this action on behalf of her minor son, M.E., seeking

judicial review, pursuant to 42 U.S.C. § 405(g), of a decision of the Commissioner of the Social

Security Administration (Commissioner) denying M.E.'s application for child's supplemental

security income (SSI) benefits under Title XVI of the Social Security Act (Act).

I.   **Procedural Background:**

Plaintiff protectively filed the application for SSI on M.E.'s behalf on January 17, 2008,

alleging that M.E. was disabled due to sensory and anxiety disorders and speech problems.  (Tr.

116).   An administrative hearing was held on September 29, 2009, at which Plaintiff and her

neighbor testified.  (Tr. 15-41).  Plaintiff was represented by counsel.

The ALJ, in a written decision dated January 20, 2010, found that M.E. was not disabled,

as M.E. did not have an impairment that met or was medically or functionally equal to a listed

impairment.  (Tr. 51).

Plaintiff then requested a review of the hearing decision by the Appeals Council which

denied that request on September 30, 2010.  (Tr. 1-3).  Subsequently, Plaintiff filed this action.

-1-

(Doc. 1).  Both parties have filed appeal briefs, and have consented to the case being decided by the undersigned.  (Doc. 7).  Briefs have been filed by the parties and the matter is now ripe for determination.  (Docs. 9-10).

## II.    Evidence Presented:

Plaintiff's son, M.E. was born in 2002.  (Tr. 101).  On April 21, 2005, M.E. underwent an adenoidectomy and insertion of ear tubes.  (Tr. 335).  On September 20, 2006, T-tubes ( a type of ear tubes) were placed in M.E.'s ears.  (Tr. 343).  On October 3, 2006, a physician's report indicated that M.E. was diagnosed with meningitis two to three weeks prior thereto, and was hospitalized for about one week.  (Tr. 176).  Subsequent visits to the Ear, Nose and Throat Center of the Ozarks on October 17, 2006, and January 3, 2007, indicated that M.E.'s ear tubes were doing very well.  (Tr. 332-33).

On April 3, 2007, a Springdale Public School District Evaluation/Programming Conference Decision Form substantiated that M.E. had been determined to have the disability of speech or language impairment, and recommended that M.E. undergo articulation therapy to address his phonological processes.  (Tr. 157-158).  In a Speech and Language Addendum dated April 3, 2007, prepared by the Springdale Public School District, the impression was that M.E. did exhibit an articulation impairment at that time that was not age appropriate, but that his language, voice and fluency skills were within normal limits.  (Tr. 179).  Also dated April 3, 2007 is an "Arkansas Severity Ratings Assignment," which indicated that language components, voice components, and fluency components were all rated normal, but that articulation components were all rated severe.  (Tr. 181 )

A visit to the Ear, Nose and Throat Center of the Ozarks on May 16, 2007, indicated that

AO72A
(Rev. 8/82)

M.E. was doing well with the ear T-tubes, and that he also suffered from rhinitis. (Tr. 331).

On May 31, 2007, a Speech and Language Evaluation was conducted by Pamela K. Petray, MA-CCC/SLP, of Pediatric Autism Center of Excellence (PACE). (Tr. 185-190). Ms. Petray noted that M.E.'s mother requested speech therapy at that facility due to concern for her son's speech and language delay. His mother was also concerned about his negative behavior and his unintelligible speech, and said that at times even she could not understand what M.E. wanted, which typically elicited frustration. (Tr. 185). Ms. Petray indicated that during the evaluation, M.E. demonstrated restlessness, impulsivity, and reduced tolerance for inhibitory words when the clinician requested that he "wait" or "listen first." (Tr. 185). However, she also noted that M.E. did follow the directions despite his dislike for them. She found M.E. to be a personable young boy to work with and, with cues, he was able to participate well. She believed that there was great potential for learning for M.E., and recommended aggressive therapy to "get him on his way." (Tr. 186). Ms. Petray's impression was as follows:

| | | |
|---|---|---|
| 1. | Articulation skills: | Severely delayed |
| 2. | Receptive Language Skills: | WNL (within normal limits) |
| 3. | Expressive Language Skills: | Severely delayed |
| 4. | Oral Motor Skills: | Range: WNL overall |
| | | Strength: Severe Delay with jaw/tongue |

Speech Diagnosis:
1. Severe Speech Delay
2. Severe Expressive Language Delay

(Tr. 189). Ms. Petray recommended that M.E. receive aggressive individual speech therapy services to include articulation and expressive language, consisting of 5 times per week for 60 minute sessions. She further recommended that: a) expressive language emphasis should be placed on, but not limited to, slowing speech rate, separating words, and sentence formulation;

-3-

b) articulation emphasis should be placed on, but not limited to, increased eye contact for visual model, proper tongue placement for sounds in error;  and c) oral motor emphasis should be placed on, but not limited to, tongue strengthening exercises and jaw strengthening exercises. (Tr. 189).  Progress notes from PACE are contained in the record for the time period from June 2007 to December of 2007.  (Tr. 191-229).

A Diagnostic Evaluation from Perspectives Behavioral Health Management, LLC. was performed on September 25, 2007.  (Tr. 366-384).  In the evaluation, the diagnoses given was:

| | |
|---|---|
| Axis I: | 300.00 Anxiety Disorder NOS |
| | R/O 309.81 PTSD(post traumatic stress disorder) |
| | R/O 995.53 Sexual abuse of child (victim) |
| Axis II: | V71.09 (no diagnosis on Axis II) |
| Axis III: | had spinal viral meningitis 2006 |
| | Tubes in ears (3rd set now) |
| | Lots of dental work this year |
| | Asthma |
| | Allergies |
| Axis IV: | primary support issue; social environmental issue |
| Axis V: | 60-51 |

(Tr. 382-83).  The physician's certification of the evaluation stated that although he had not seen M.E. face-to-face, based on the information provided by the MHP (mental health professional) performing the evaluation, he concurred with the diagnostic formulation, the problems identified for treatment, the recommended work-up and interventions, and felt that behavioral health services were likely to result in improvement or prevent regression.  The authorization was limited to 45 days.  (Tr. 384).

In a September 28, 2007 Physician Certification of Serious Emotional Disturbance document from Perspectives Behavioral Health Management, LLC., the diagnosis was:

| | |
|---|---|
| Axis I: | 300.00 Anxiety Disorder NOS; R/O 309.81 R/O 995.53 |

-4-

| | |
|---|---|
| Axis II: | V71.09 - None noted |
| Axis III: | asthma; allergies; third set of tubes in his ear currently; spinal viral meningitis last year; deaf first year of life |
| Axis IV: | Primary support; social; educational |
| Axis V: | 52 |

(Tr. 361).  The diagnosis also stated that the disorder resulted in a functional impairment, which substantially interfered with or limited the child's role or functioning in family, school, or community activities.  The functional impairments listed were: anxiety at home; fear of brother; seen past abuse to mother;  sleep disturbances; can be compulsive;  attention and touch issues. (Tr. 361).

In an October 5, 2007 Physician Certification of Serious Emotional Disturbance document from Perspectives Behavioral Health Management, LLC., the diagnosis was:

| | |
|---|---|
| Axis I: | 300.00 |
| Axis II: | No dx |
| Axis III: | Asthma, hx nasal infections |
| Axis IV: | Social, (illegible) |
| Axis V: | 52 |

(Tr. 360).  The diagnosis also stated that the disorder resulted in a functional impairment, which substantially interfered with or limited the child's role or functioning in family, school, or community activities.  The functional impairments were listed as anxiety, sleep, and some compulsive (illegible) attention issues.  (Tr. 360).

On October 5, 2007, an initial evaluation was performed at Perspectives Behavioral Health Management, LLC.  (Tr. 362-365).  The diagnostic impression was:

| | |
|---|---|
| Axis I: | 300.00 - Anxiety d/o NOS; R/O PTSD |
| Axis II: | various developmental delays per mom |
| Axis III: | Asthma, anxiety, hx viral meningitis |
| Axis IV: | Social, (illegible) |
| Axis V: | 52 |

-5-

no med.

(Tr. 365).

On December 4, 2007, on a one page prescription form, Dr. Elizabeth Froman, at The Children's Clinic at Willow Creak, diagnosed M.E. with sensory processing disorder. (Tr. 244).

On December 11, 2007, an occupational therapy evaluation was performed by Adriane Hylle, an occupational therapist with Jarvis Pediatric Therapy, Inc. (Tr. 246-251). Ms. Hylle found M.E. to be very pleasant and cooperative, and that he gave a good effort throughout the evaluation. (Tr. 249). M.E. scored in the 75% range on VMI (visual motor skills), with an age equivalence of 6 years, 3 months. He scored in the 1st percentile with an age equivalence of 4 years and 1 month "with 11% in hand-eye coordination and 99% in grasp." (Tr. 249). On the sensory profile, Ms. Hylle reported that M.E. scored "definite difference" in 3/6 areas of behavior and emotional responses and 6/9 areas under "factor." She also reported that he scored "p robable difference" in 3/6 areas of sensory processing, 2/5 areas of modulation, 1/3 areas in behavior and emotional responses, and 2/0 areas under "factor." (Tr. 249). She found M.E.'s strengths were "family support; generally cooperative; and curious." (Tr. 250). His areas of deficit included: fine motor skills; auditory processing skills; gross motor skills; "decreased strength (trunk/B UE)"' sensory processing skills; attention to task; decreased "ADL skills; decreased cutting skills; and decreased handwriting skills. (Tr. 250). Ms. Hylle recommended that M.E. receive individual occupational therapy treatment in the clinic, 2 sessions per week, 60 minutes each, for a total of 120 minutes. (Tr. 250).

On January 14, 2008, a Speech-Language Medicaid Addendum was completed by Wendy L. Privette-Cassady, M.S. CCC-SLP, of Wendy Cassady Speech Pathology, Inc., wherein it was

AO72A
(Rev. 8/82)

noted that M.E. continued to receive school based services, three times a week. It was felt that M.E. demonstrated severe language delays and articulation delays, that he demonstrated scores falling more than 2.0 standard deviations below the mean in several areas, and continued to qualify for speech services, based on the scores. (Tr. 324). Progress notes from Wendy Cassady Speech Pathology, Inc., dated February 12, 2008 to June 17, 2008, are a part of the record. (Tr. 311-323). Although it was noted in these progress notes that M.E. was "hyper" or "fidgety" during some of the sessions, and needed reminders to be quiet and listen, for the most part, M.E. "worked well" at the sessions.

On March 3, 2008, Shannon R. "Becky" Bassett, M.S.CCC-SLP, with Wendy Cassady Speech Pathology, Inc., completed a social security form wherein she reported that M.E.'s sounds, omissions, distortions, phonological patterns or fluency were not typical for this age group. She reported that 50% of M.E.'s conversational speech was intelligible on the first attempt and with repetition. (Tr. 183).

On March 5, 2008, Ruth Linam, M.A., CCC-SLP, completed the same social security form, wherein she reported that 75% of M.E.'s conversational speech was intelligible on the first attempt and with repetition. (Tr. 184). She reported that M.E. had made significant progress in speech therapy that year, and that his intelligibility had improved greatly in the previous six months. (Tr. 184).

On March 6, 2008, Lisa Williams, M.E.'s kindergarten teacher, completed a Teacher Questionnaire. (Tr. 125-134). She reported that she had known M.E. for six months; that M.E. had no problems acquiring and using information; no problems attending and completing tasks; a slight problem interacting and relating with others; a slight problem moving about and

-7-

manipulating objects; no problems caring for himself;  and she had never seen M.E. have an asthma attack, or marked symptoms. (Tr. 128-133).  She reported that it had not been necessary to implement behavior modification strategies for M.E.  (Tr. 130).  She also reported that when the topic of conversation was known or unknown, she could understand almost all of M.E.'s speech on the first attempt. (Tr. 131).  She felt that it would be beneficial for M.E. to receive his speech and occupational therapy at school, since he left early for additional speech outside of the school's speech classes, and for occupational therapy.  (Tr. 134).

On March 21, 2008, Pamela K. Petray completed the same social security form, wherein she reported that 0-25% of M.E.'s conversation speech was intelligible on the first attempt, and 50% of his conversation speech was intelligible with repetition.  (Tr. 182).   She also reported that M.E.'s ability to imitate words was limited.

On April 14, 2008, a Mental Diagnostic Evaluation and Intellectual Assessment was completed by Mary J. Sonntag, Psy.D.  (Tr. 230-234).  She noted that M.E. had never been hospitalized for mental problems, but had been seen at Perspectives Behavioral Health Management, LLC. for the previous year by a clinical psychologist.  She reported that M.E. had a noticeable speech impediment, but was understandable; his thought process was within normal limits for a 5 year old;  he had no problems with thought content;  and that his IQ scores indicated he was in the high average to superior range of intelligence.  (Tr. 231-232).  She reported that the problem with his mother needing to be in his line of sight was not true at the testing center.  Instead, she reported that M.E. was easily disengaged from his mother to go to the evaluation room, and never asked for his mother.  When his mother went to the evaluation room and M.E. went to the lobby to play while his mother answered questions, he seemed very

happy and did not require her attention. (Tr. 233). Dr. Sonntag further stated: "His inability to perform even basic self-help skills or control his emotions in the presence of his mother would suggest the possibility of poor parenting skills or boundary/enmeshment issues." (Tr. 233). She diagnosed M.E. as follows:

| | |
|---|---|
| Axis I: | Expressive Language Disorder |
| Axis II: | N/A |
| Axis IV: | Primary support group |
| Axis V: | GAF - 61 |

(Tr. 233). Dr. Sonntag found M.E. was able to communicate and interact in a socially adequate manner; attended and sustained concentration on basic tasks within normal limits for his age group (with just a slight amount of fidgeting); and was persistent in completing tasks, although the tasks on the IQ test were short. (Tr. 234).

On April 22, 2008, the Ear, Nose & Throat Center of the Ozarks reported that M.E.'s speech delay appeared to be improving, and that he should continue with speech therapy. (Tr. 326). He was also noted as doing well with his ear T-tubes in place.

On May 14, 2008, a Childhood Disability Evaluation Form was completed by non-examining physician, Dr. Stephen A. Whaley. (Tr. 238-243). He found M.E.'s impairments to be expressive language disorder, and anxiety disorder. (Tr. 238). He found his impairments were "not severe," and that although M.E. carried a diagnosis of anxiety disorder, and alleged behavioral, social and communicative dysfunction, such was not substantiated by the teacher or examining psychologist. (Tr. 238). He reported that there was a conflict in the file with "two CCC-SLP's- one opinion intelligibility <50% and the other opinion intelligibility >75%," and that the teacher and examining psychologist both indicated functional and intelligible

communication. (Tr. 238). He also noted that the treating source in December of 2007 stated that M.E.'s speech and development were normal; that expressive language score was depressed; and that summarily MER indicating social, behavioral and communicative dysfunction was "anecdotal and not substantiated by independent observers of function." (Tr. 243).

On May 16, 2008, a Speech-Language Evaluation was completed by Ms. Bassett, M.S. CCC-SLP, from Wendy Cassady Speech Pathology, Inc. (Tr. 306-310). She noted that M.E. had been seen for 16 therapy sessions since February of 2008, and was previously seen for speech therapy by PACE. (Tr. 306). She reported that M.E. demonstrated a short attention span and impulsivity throughout therapy sessions. She also reported that M.E.'s articulation score fell within normal limits for his chronological age, indicating no articulation delay at that time. (Tr. 307). With respect to M.E.'s language, she reported that M.E. exhibited fewer social skills than expected in the area of assertion, and that his standard score of 87 fell within the low average range for his age and sex. (Tr. 308). Her overall impression was that M.E.'s articulation, receptive language, and pragmatic skills were within normal limits, and that his expressive language skills fell more than 2 standard deviations below the mean for his chronological age, indicating a severe delay in his expressive language development. (Tr. 309). Ms. Bassett further noted that M.E. demonstrated moderate to severe fluency and voice deficits due to his labored, slow rate and halted speech, and that he continued to demonstrate decreased tongue and jaw strength, which directly affected his fluency and voice abilities. (Tr. 309).

On September 9, 2008, consultative psychologist Terry L. Efird, Ph.D., completed a Mental Diagnostic Evaluation. (Tr. 348-351). He stated that if M.E. had some type of pervasive developmental disorder, "it certainly appears to be a very mild case." (Tr. 348). M.E.'s mother

-10-

maintained that M.E. was performing "very well" academically.  (Tr. 349).  Dr. Efird reported

that some type of mild expressive speech difficulty was noted, but otherwise, M.E.'s speech was

reasonable.  (Tr. 349).  Dr. Efird reported that M.E. interacted in an age-appropriate manner, and

was described as performing daily activities and behaviors probably in an age-appropriate

manner.  (Tr. 350).  He found M.E. appeared to be of "probably average intelligence," and that

ratings from his teacher did not note remarkable problems in the classroom setting.  "Therefore,

no mental diagnoses will be provided at this time."  (Tr. 350).  Accordingly, Dr. Efird gave the

following diagnosis:

> Axis I:          no diagnosis
> Axis II:         no diagnosis
> Axis V:          55-65

(Tr. 350).  Dr. Efird also completed a form entitled "Effects of Identified Mental Impairments

on Adaptive Functioning."  (Tr. 351).  In the form, Dr. Efird reported that M.E.'s ability to

perform most activities of daily living in an age-appropriate manner was "probably reasonable,"

and that socially "he maintained tending to get along with peers at school."  (Tr. 351).  He found

that M.E. communicated and interacted in an age-appropriate, reasonably intelligible and

effective manner; had the capacity to perform basic cognitive tasks; appeared able to track and

respond adequately for the purposes of the evaluation; and no remarkable problems with

attention/concentration were noted.  (Tr. 351).  Dr. Efird also reported that M.E. generally

completed tasks assigned during the evaluation and no remarkable problems with mental pace

of performance were noted.  Dr. Efird acknowledged that no formal validity assessment

techniques were employed, and that he had a question regarding M.E.'s reported "sensory

disorder (?)," which he was "certainly unable to be clear at this time."  He found that adequate

-11-

effort appeared to be offered during the evaluation, and that the results were viewed as likely representing a reasonable estimate of current functioning.  (Tr. 351).

On September 11, 2008, a Childhood Disability Evaluation Form was completed by Dr. William Collie, and he found that no impairments were established.  (Tr. 354).  He noted that the claimant alleged a "sensory" disorder.  However, he reported that the Psych CE vendor could not establish this diagnosis in "either a 1* or 2* manner."  (Tr. 354).

On September 22, 2009 , a letter was written "To Whom it May Concern" from Christal Janssen, Psy.D., a clinical psychologist with Perspectives Behavioral Health Management, LLC. (Tr. 387-390).  She reported that M.E. and his mother were first seen at her facility for an initial diagnostic evaluation on September 8, 2008.  She stated that he was initially admitted to their outpatient mental health clinic, but was referred to their Child Day Treatment program in February of 2008, "due to escalating problems with behavior, mood, and difficulty in public school."  She reported that M.E. was "currently diagnosed with Anxiety Disorder, NOS, Post Traumatic Stress Disorder, and Disruptive Behavior Disorder."  According to testimony of M.E.'s mother at the hearing, it was as a result of his behavior in public school that M.E. was pulled out of public school and began going to the Perspectives Behavioral Health Center Management, LLC.  (Tr. 24).  She also testified that since then, M.E. was talking more and receiving some benefit from their services.  (Tr. 25).  She stated that they wanted M.E. to try public school again, but that he did not want to go back.  (Tr. 25).  Ms. Janssen reported that several scores were below what would be expected, given M.E.'s age and grade, and that his scores in Word Reading, Reading Comprehension, and Written Expression were below both age and grade level.  She believed he would likely need one-on-one attention, tutoring, or resource

-12-

class in those areas.  (Tr. 390).  However, she also found that his scores in Math Reasoning (word problems that were read to him), Listening Comprehension, and Oral Expression were above age and grade level, and that in school, he would do better on lessons that were given verbally or when he could give his answers verbally.  (Tr. 390).  In her summary, Ms. Janssen stated that M.E. would continue in Day Treatment at Perspectives Behavioral Health Center Management, LLC. to receive intensive individual, family, and group therapy, and would also receive case management and medication management.  (Tr. 390).  She reported that while he was in Day Treatment, M.E. would regularly meet with a physician to monitor symptoms and compliance and response to treatment interventions.   She noted that goals for treatment included: improving compliance and decreasing disruptive behaviors in the home; learning and utilizing affective modulation skills; monitoring at-risk behaviors;  teaching conflict resolution skills;  and developing and utilizing more effective communication and social skills.  (Tr. 390).

In a Function Report dated January 17, 2008, M.E.'s mother reported that M.E. had problems talking clearly, and that his speech could hardly ever be understood by people who did not know him well.  (Tr. 106).  She felt that M.E.'s ability to communicate was limited, in that he did not use complete sentences of more than four words most of the time; did not take part in conversations with other children; and could not deliver simple messages, such as telephone messages.  (Tr. 107).  She further reported that M.E. could not define common words, could not ride a big wheel, tricycle, or bicycle with training wheels; did not play "pretend" with other children; did not dress himself without help (except tying his shoes); did not wash or bathe without help; did not brush his teeth without help; and did not put his toys away.  (Tr. 108-110).  In an undated Disability Report, Plaintiff's mother reported that M.E.'s disabling illnesses,

-13-

injury, or condition was sensory and anxiety disorders and speech problems.  (Tr. 116).  She

noted that M.E.'s medications were Albuterol, Flovent, and Singulair for asthma. (Tr. 120).  She

also reported that M.E. was not in special education, but was in speech therapy.  (Tr. 122).

  In an undated Disability Report - Appeal, M.E.'s mother reported that she could not take

him in public too often because it was too much for him.  He would start screaming and yelling

if she was out of his sight, and he did not like bright lights or loud noises.  (Tr. 138).  She stated

that M.E. would not interact with most kids, and the ones he did interact with had some type of

special needs. (Tr. 138).  In another undated Disability Report - Appeal, M.E.'s mother reported

that M.E. was not expressing what was happening to him at times.  (Tr. 149).

  At the hearing held on September 29, 2009, M.E.'s mother testified that M.E. was then

attending a non-public school, because of some "behavioral problems he was having."  (Tr. 21-

22).  She stated that M.E. did not know how to interact with other children his age, and that he

would do really well at school, but when he got home, he would have his "meltdowns."   He

would hit the bed, scream, yell, go in his room and hide under the bed or behind a chair.  When

his mother asked him what was wrong, M.E. said he did not understand the games the other

children were playing, and it was confusing for him.  (Tr. 24).  She stated that M.E. was finally

starting to talk more now than what he had in the last year, and that he was receiving some

benefit from the therapists, but that M.E. did not want to go back to public school.  (Tr. 25).

M.E.'s mother also stated that M.E. was a little behind academically in certain areas.  She said

that he did not like going out in public, and that if he could not see her, he would start screaming

hysterically.  (Tr. 28).  She stated that M.E. was a "wiz" on a computer, but had difficulty in

maintaining focus for any period of time.  (Tr. 29).  She further stated that the arguments and

-14-

physical outbursts by M.E. happened daily.  (Tr. 29).

Karen DeAnn Davison, a neighbor of Plaintiff's, also testified at the hearing, stating that she got to know Plaintiff because her son was friends with M.E., so they had known each other for about 5 years.  (Tr. 35).   She testified that when M.E. was two or three years old, she saw him become really agitated when he was around a lot of noise, or when there were a lot of things going on around him.  (Tr. 36).  She testified that two weeks prior to the hearing, she witnessed M.E. when he lost his teddy bear and he was going around the house, looking for him.  He became more upset because he could not find the bear, and she then heard him screaming in the back bedroom, and he was hitting himself.  (Tr. 37).  She testified that M.E. had a hard time interacting with other children his age.  She had also seen him be very affectionate with girls, touching them inappropriately, and that one had to constantly tell him to stop.  (Tr. 39).

## III.   Applicable Law

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.   The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the

-15-

evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

The regulations prescribe a three-step process for making the disability determination. First, the ALJ must determine whether the child has engaged in substantial gainful activity.  See 20 C.F.R. 416.924(b).  Second, the ALJ must determine whether the child has a severe impairment or combination of impairments.  See 20 C.F.R. 416.924(c).  Third, the ALJ must determine whether the severe impairment(s) meets, medically equals, or functionally equals a listed impairment.  See 20 C.F.R. § 416.924(d).  In the present case, the ALJ found that M.E.'s claim failed at step three, as M.E. did not have an impairment that met or medically or functionally equaled a listed impairment.  The ALJ specifically considered the Listing in 112.02, Organic Mental Disorders, when making this determination.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  More specifically, the ALJ found that the evidence of record did not demonstrate that "the claimant's expressive language delay results in marked impairment in age-appropriate cognitive/communicative function, social function, personal functioning, or maintaining concentration, persistence, or pace."  (Tr. 51, footnotes omitted).

The Court finds there is substantial evidence in the record to support the ALJ's determination that M.E.'s impairments did not meet or medically equal in severity any listed impairment.  See 20 C.F.R. Part 404, Subpt. P, App. 1, Part B.  The Court next addresses whether M.E.'s impairments are functionally equal to any listed impairment, or, in other words, whether "what [M.E.] cannot do because of [his] impairments . . . is functionally equivalent in severity to any listed impairment that includes disabling functional limitations in its criteria." 20 C.F.R. § 416.926a(a).  Functional equivalence may be established by demonstrating marked

-16-

limitations in two, or extreme limitations[1] in one of the following "domains:"  1) acquiring and using information;  2) attending and completing tasks;  3) interacting and relating with others;  4) moving about and manipulating objects;  5) caring for yourself;  and 6) health and physical well-being.  See 20 C.F.R. § § 416.926(b)(1), 416.926a(d).  The ALJ should consider all relevant evidence in the case to determine whether a child is disabled, and the evidence may come from acceptable medical sources and from a wide variety of "other sources," including teachers.  SSR 09-2P.  In fact, the Commissioner's regulations for childhood disabilities "provide that parents and teachers, as well as medical providers, are important sources of information."  Lawson v. Astrue, 2009 WL 2143754, at *9 (E.D. Mo. July 13, 2009), citing 20 C.F.R. § 416.9249.

The ALJ in this case found that M.E. had a less than marked limitation in acquiring and using information; no limitation in attending and completing tasks; less than marked limitation in interacting and relating with others; no limitation in moving about and manipulating objects; no limitation in the ability to care for himself; and no limitation in health and physical well-being.  Accordingly, the ALJ found that M.E. did not have an impairment or combination of impairments that resulted in either "marked" limitations in two domains of functioning or an

---

[1]((2)Marked limitation -(I)We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities.  Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities.  "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean....  (3)Extreme limitation - (I) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities.  Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities.  "Extreme" limitation also means a limitation that is "more than marked."  "Extreme" limitation is the rating we give to the worst limitations.  However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § § 416.926a(e)(2) and (3).

-17-

"extreme" limitation in one domain of functioning.  (Tr. 63).

## IV.   Arguments of the Parties:

Plaintiff argues that the ALJ erred in failing to properly consider the opinions and findings of the primary treating physicians as required by law, particularly the opinion of Dr. Janssen.  Plaintiff also argues that the ALJ neglected to fully and fairly develop the medical record by disregarding M.E.'s mother's testimony and the testimony of his neighbor, and neglecting to fairly and adequately evaluate all of M.E.'s subjective claims.  Defendant argues that there is substantial evidence to support the ALJ's findings.

## V.   Discussion:

### A.  Weight Given to Opinions

Plaintiff argues that the ALJ failed to give Dr. Janssen's opinion sufficient weight.

 "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" (citations omitted).  "The record must be evaluated as a whole to determine whether the treating physician's opinion should control." (citation omitted).  When a treating physician's  opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." (citation omitted).

Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010).

The ALJ gave significant weight to the consultative examiners Dr. Efird, Dr. Sonntag, and non-examining physicians Dr. Whaley and Dr. Collie.  The ALJ addressed Dr. Janssen's opinion by noting that she opined that M.E.'s overall achievement was above commiserate with what would be expected based on an overall predicted achievement method.  He also noted that although Dr. Janssen found some scores were below age and grade level, and that M.E. would likely need one-on-one attention, tutoring, or resource classes, she also found some scores were

-18-

above age and grade level.  (Tr. 56).

Dr. Janssen stated that M.E. was extremely affected by anxiety, and discussed this issue at length.  However, she also noted that the teacher reported that M.E. worked hard in class, but was behind grade level and needed significant assistance.  (Tr. 387).  She also noted that M.E. did participate in most therapeutic activities, but required a strict behavior modification program to manage mood and behaviors.  It is noteworthy that M.E.'s mother testified that "they," wanted M.E. to try and go back to public school.[2]  The Court does not believe the individuals at Perspectives Behavioral Health Management, LLC. would want M.E. to try to return to public school had they felt that M.E. had not made substantial improvement in his ability to function and interact at that level.

The Court also notes that although Dr. Froman diagnosed M.E. with sensory disorder, as stated by the ALJ, there was no indication of objective findings to substantiate a diagnosis, nor is such a finding consistent with the other physicians, both examining and non-examining.  The Court is of the opinion that there is substantial evidence to support the weight given to the treating physicians by the ALJ.

**B.  Domains:**

**1.  Acquiring and Using Information**

Although speech therapist Pamela Kay Petray evaluated M.E. on May 31, 2007, and opined that M.E. had a severe speech delay and expressive language delay,  on March 5, 2008, Ruth Linam found M.E. had made significant progress in speech therapy that year, and that his

---

[2]In the context in which M.E.'s mother made this statement, it appears she was referring to the people at Perspectives Behavioral Health Management, LLC..

intelligibility had improved greatly in the previous 6 months. (Tr. 184). The ALJ properly noted the inconsistent findings relating to M.E.'s expressive language development given by Dr. Sonntag, Ms. Bassett, Dr. Efird, and Teacher Williams. (Tr. 56). The Court also notes that Dr. Janssen found M.E.'s written expression scores were below age and grade level, but his oral expression scores were above age and grade level. It is also noteworthy that the evaluation performed by Dr. Efird on September 9, 2008, indicated that M.E. communicated and interacted in an age-appropriate, reasonably intelligible, and effective manner, that he had the capacity to perform basic cognitive tasks, and that he appeared able to track and respond adequately for the purposes of the evaluation. M.E. also had no remarkable problems with attention/concentration, and generally completed tasks assigned during the evaluation. Dr. Efird found "no diagnosis" on Axis I and Axis II. Even a speech evaluation by Ms. Bassett at Wendy Cassady Speech Pathology, Inc., completed on May 16, 2008, which indicated that M.E. had been seen there for 16 therapy sessions since February of 2008, indicated that M.E.'s articulation score fell within normal limits for his age, indicating no articulation delay at that time. In fact, M.E.'s articulation, receptive language, and pragmatic skills were noted as being within normal limits. It was only M.E.'s expressive language skills that fell more than 2 standard deviations below the mean for his age, indicating a severe delay in his expressive language development. It was also reported that M.E. continued to demonstrate decreased tongue and jaw strength, which directly affected his fluency and voice abilities.

Also noteworthy, and recognized by the ALJ, is the fact that M.E.'s kindergarten teacher, Teacher Williams, observed only a slight problem in his ability to relate experiences and tell stories; using language appropriate to the situation and listener; and using adequate vocabulary

-20-

and grammar to express thoughts/ideas in general, everyday conversation.

The ALJ also noted that with respect to M.E.'s academic record, the evidence did not support the extent and severity of limitations alleged, and the Court agrees. His intelligence was found to be average or above average, and some of his scores were above age and grade level.

The Court finds there is substantial evidence to support the ALJ's finding that M.E. had a less than marked limitation in acquiring and using information.

### 2.  Attending and Completing Tasks

The ALJ found M.E. had no limitation in attending and completing tasks, and the Court believes the record supports such a finding. As early as May 31, 2007, when Ms. Petray evaluated M.E., she found that although M.E. demonstrated restlessness, impulsivity, and reduced tolerance for inhibitory words when the clinician requested that he "wait" or "listen first," she also reported that M.E. did follow the directions despite his dislike for them. Ms. Hylle, the occupational therapist, noted that M.E. required occasional cues to attend to task, but stated that M.E. gave a good effort throughout the evaluation. Teacher Williams also found that M.E. had no problems attending and completing tasks. Dr. Sonntag found that M.E.'s ability to attend and sustain concentration on basic tasks was within normal limits for his age group (with just a slight amount of fidgeting), and that he was persistent in completing tasks. Finally, Dr. Efird found that M.E. had the capacity to perform basic cognitive tasks, and appeared able to track and respond adequately for purposes of the evaluation, and generally completed tasks assigned during the evaluation.

The Court finds there is substantial evidence to support the ALJ's finding that M.E. had no limitation in attending and completing tasks.

AO72A
(Rev. 8/82)

### 3. Interacting and Relating with Others

The ALJ found that M.E. had less than marked limitation in interacting and relating with others.  M.E.'s mother reported to Ms. Petray that not only did she have concern for M.E.'s speech delay, but was concerned about his negative behavior.  M.E.'s mother reported that she could not take M.E. out in public too often because it was to much for him, that if she was out of his sight, he would start screaming, that he did not like bright lights or loud noises, did not interact with most children, and that he could not do the same thing other children his age could do.  She told Dr. Sonntag that M.E. was more sensitive to his surroundings and would go into major anxiety attacks.  She further said that M.E. always has to keep touching.  At the hearing, M.E.'s mother testified that M.E. did not know how to interact with other children, and complained that he did not know what the other children were trying to teach him.  She also stated that other children shunned him a lot.  The mother's neighbor testified that she had witnessed some of M.E.'s "meltdowns," and that she also noticed that M.E. was inappropriately affectionate and touched inappropriately.

Teacher Williams indicated on the Teacher Questionnaire that M.E. had a slight problem interacting and relating with others, but that it had not been necessary to implement behavior modification strategies for M.E.  In Dr. Sonntag's assessment, Dr. Sonntag observed that the mother's complaint about needing to be in M.E.'s line of sight was not true at the testing center.  She noted that M.E. easily disengaged from his mother to go to the evaluation room and that he seemed very happy and did not require her attention when she went to the evaluation room and he went to the lobby to play.  She further stated: "His inability to perform even basic self-help skills or control his emotions in the presence of his mother would suggest the possibility of poor

-22-

parenting skills or boundary/enmeshment issues."

The Court finds there is substantial evidence to support the ALJ's finding that M.E. had less than marked limitations in interacting and relating with others.

### 4.  Moving About and Manipulating Objects

The ALJ found that M.E. had no limitation in moving about and manipulating objects. Teacher Williams reported that M.E. had only a slight problem moving and manipulating things; demonstrating strength, coordination, dexterity in activities or tasks; managing pace of physical activities or tasks; and integrating sensory input with motor output.  She further stated that M.E. "is as independent as the average kindergarten student."

Ms. Hylle, an occupational therapist, found that M.E.'s upper extremity strength was 4/5 and that his range of motion was within normal limits; that M.E. had normal muscle tone; was unable to maintain full prone extension and full supine flexion; that he had no difficulty crawling but had slight difficulty rolling in a straight line; was able to two foot jump; his primitive reflexes were intact/integrated; that his righting reactions were intact, with slight delay on the bolster swing; that his equilibrium and protective responses were intact; and that he used a "tripod grasp" and switched hands during writing.  She noted that M.E. scored in the 11th percentile of the hand eye-coordination portion of the evaluation; scored above age level on the visual motor; required occasional cues to attend to task; demonstrated some difficulty following multistop verbal commands; and had slight difficulty with asymmetric movements.  She recommended that M.E. receive individual occupational therapy treatment in the clinic two sessions per week, 60 minutes each, for a total of 120 minutes.  Dr. Efird found that M.E. performed daily activities and behaviors "probably in an age-appropriate manner."  Although the

-23-

Court believes there is substantial evidence to support the ALJ's finding of no limitation in this area, even if the Court were to hold otherwise, at most, the evidence would only support a slight limitation in this domain, and it would not rise to the level of "marked" or "extreme."

### 5. Caring for Yourself

The ALJ found that M.E. had no limitation in the ability to care for himself, referring to Dr. Efird's report that M.E. was capable of dressing himself reasonably at times.  Dr. Efird also reported that M.E. reportedly did some chores (e.g., clean his room, washes his plate, and attempts to take out the trash).  Teacher Williams observed no problems in this area, and reported that his functioning appeared age-appropriate.  In a January 17, 2008 Function Report, M.E.'s mother indicated that he did not dress himself without help (except tying shoes), did not wash or bathe without help, did not brush his teeth without help, and did not put his toys away.  However, by April 14, 2008, M.E.'s mother reported to Dr. Sonntag that M.E. was just learning to take care of bathroom needs, and washed his hair for the first time two weeks previously.

The Court finds there is substantial evidence to support the ALJ's finding that M.E. had no limitation in the ability to care for himself.

### 6. Health and Physical Well-Being

The ALJ found that M.E. had no limitation in health and physical well-being.  There appears to be no question that M.E. suffered form asthma and allergies, and had the third set of tubes placed in his ears.  However, the tubes were reportedly doing well, and there is no indication that the medications he was taking were not controlling his asthma.  Teacher Williams reported she had never seen M.E. have an asthma attack or marked symptoms, and noted that M.E. had an inhaler, but she was unsure if he used it on a regular basis.  There was no evidence

AO72A
(Rev. 8/82)

in the record that indicated that M.E.'s asthma and allergies constituted more than minimal limitations, and the Court finds there is substantial evidence to support the ALJ's finding that Plaintiff had no limitation in health and physical well-being.

## IV. Conclusion

Based upon the foregoing, the Court hereby finds that there is substantial evidence to support the ALJ's findings and conclusions. Accordingly, the Court hereby affirms the ALJ's decision and dismisses Plaintiff's case with prejudice.

IT IS SO ORDERED this 3rd day of January, 2012.


/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-25-